Hon. Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LAWRENCE SHERMAN,

                       Plaintiff,

          v.

PATRICK R. DONAHOE,

                    Defendant.

No. C08-1533-RAJ

**DEFENDANT'S TRIAL BRIEF**

Pursuant to this Court's Order of August 4, 2011 (Dkt. 85), Defendant Patrick R. Donahoe, in his official capacity as Postmaster General of the United States Postal Service (the "USPS"), by and through his undersigned counsel, respectfully hereby submits this Trial Brief, in anticipation of the trial of this matter set to begin on December 5, 2011.

## I.  INTRODUCTION

Plaintiff Lawrence Sherman brought suit against the USPS, alleging that, in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e *et seq*., "Title VII"), the USPS terminated him in December 2006 in retaliation for having filed, in November 2005, an Equal Employment Opportunity ("EEO") Complaint.  Plaintiff seeks over $2.7 million in unspecified damages.

The trial of this case turns on the determination of three overarching facts: (1) whether Plaintiff can show that he filed his 2005 EEO Complaint in "good faith" or, otherwise, can make a *prima facie* case of retaliation; (2) whether the USPS can produce a legitimate, non-retaliatory reason for terminating Plaintiff; and (3) whether Plaintiff can convince this Court, as he must, that the USPS' proffered reason is pretextual; that is, that the USPS employees who terminated Plaintiff "did not

1  honestly believe their own proffered reasons" for terminating him and that, "but for" the fact that he

2  filed the 2005 EEO Complaint, the USPS would not have terminated him.  The evidence will show that

3  all three facts favor Defendant.

4       As to the first (Plaintiff's *prima facie* case), Plaintiff previously admitted, without qualification,

5  that his 2005 EEO Complaint "was not about discrimination," but just for "the money."  This Court

6  initially granted summary judgment in favor of Defendant finding that, based on these and other similar

7  admissions, Plaintiff's 2005 EEO Complaint was not brought in "good faith," *i.e.* that Plaintiff did not

8  have "an objectively reasonable belief that he had been the subject of race or disability discrimination."

9  Dkt. 66 at 8-9.  As part of a motion for reconsideration, Plaintiff then submitted, not one, but two

10  declarations, in which he "appears to have changed his mind" and contorted his prior testimony to argue

11  that, actually, he did believe that he was the victim of, at least, disability discrimination.  *See* Dkt. 81 at

12  2.  This Court recognized that "it is [] possible that Mr. Sherman is changing his story to survive

13  summary judgment," but held that it was a live issue for the fact finder at trial to decide.  *Id.* at 3.

14       Defendant respectfully submits that, if this Court at trial does not believe Plaintiff's contortions,

15  or if the preponderance of the evidence does not show that Plaintiff had an objectively reasonable belief

16  that he had a "valid Title VII claim," (or if, for any other reason, Plaintiff cannot make a *prima facie*

17  case of retaliation), this matter once again can, and should be, disposed of in favor of Defendant simply

18  on those facts.

19       As to the second (Defendant's non-retaliatory reason), Plaintiff has admitted that he knew his

20  unauthorized photocopying and distribution of mail and other confidential documents for his personal

21  use was "wrong" and violated the sanctity and confidentiality of those documents, which Plaintiff

22  himself had pledged to protect.  Plaintiff further has admitted that some punishment was "absolutely"

23  warranted.  Career USPS employees will testify that Plaintiff's actions "struck at the core" of the USPS'

24  mission to protect the mail and other documents in its possession.  Those facts alone satisfy the USPS'

25  burden of production.

26       As to the third (Plaintiff's burden to show pretext), Plaintiff has admitted he has no direct

27  evidence of retaliation and Defendant submits that he does not have nearly enough "specific and

28  substantial" circumstantial evidence sufficient, let alone a preponderance of such evidence, to show the

USPS' reasons for its termination are pretextual.  On the contrary, the deciding officials unanimously will testify that the 2005 EEO Complaint played no role in their decision to terminate him and that they did so, again, only because Plaintiff's actions violated the sanctity of the mail and struck at the core of the USPS' mission.

Whether it is early or late in the trial, Defendant submits that this Court should grant judgment in favor of Plaintiff and order that Plaintiff take nothing from this action.

## II. SUMMARY OF WHAT THE EVIDENCE AT TRIAL WILL SHOW

Plaintiff is a disabled African American and former employee of the USPS.

Plaintiff will testify on his own behalf and offer the live testimony from each of the three former USPS employees who informed or decided his first termination: his first line supervisor Dale Bell (Maintenance Engineering Specialist); his second line supervisor Lambert Obritsch (Manager of Maintenance); and Nick Vendetti (former Manager of the facility in which Plaintiff worked) (collectively the "Deciding Officials").  Partially subject to pending motions in limine, Plaintiff will also call several other USPS or USPS-Office of Inspector General ("USPS-OIG") current or former employees mostly for background purposes, including Anne Stanek (USPS-OIG special agent), Melinda Varszegi (USPS agency counsel), Sue Houser (USPS labor relations), Mike Merlino (former USPS Manager of Maintenance Operations), and Ronald Dudley (Plaintiff's union steward).  Finally, Plaintiff will call his family members, an undetermined number of his treating physicians, and Mr. Trent Tsuchikawa for damages purposes.

The USPS will present the Deciding Officials and Dr. Peter Nickerson for rebuttal economic analysis.  The testimony of these witnesses and the other evidence will establish the following facts:

### A.     Plaintiff's Employment at the USPS and the Filing of his 2005 EEO Complaint.

In 1997, the USPS hired Plaintiff as a custodian assigned to the Maintenance Department of the Seattle Bulk Mail Center ("BMC").  Plaintiff has congenital defects of his feet (hammertoes), which were triggered by his service in the military [1] and aggravated while he was a custodian with the USPS.  Consequently, Plaintiff was converted from a custodian to a general administrative clerk in August

---

[1] For approximately four years of his service in the military, Plaintiff was trained and served as an EEO Advisor, helping military employees work through complaints related to "race relations."

2000.  Plaintiff's new position was still located in, supervised by members of, and paid by the BMC, but he was providing administrative support to a different unit, namely, the Facility Services Office ("FSO") of the USPS' Western Area's In-Plant Support unit ("WAIPS").  In that role, Plaintiff's duties were to maintain WAIPS' files, answer the phones, open and distribute certain office mail, and make any copies WAIPS needed.[2]

In approximately early to mid-2005, Plaintiff was advised that, as part of a multi-state reorganization, the USPS was going to close the WAIPS unit in the BMC and consolidate its operations in a centralized office in Denver.  In turn, Plaintiff's modified position in WAIPS would no longer exist.  Accordingly, on August 18, 2005, Plaintiff was offered and, on August 29, 2005, accepted a position as a general administrative clerk with his original section, the Maintenance Department.

Plaintiff, however, believed that his new duties did not fairly correspond to the work he had been doing with WAIPS, which he describes as "contracting."  Plaintiff contacted an EEO counselor, also in August 2005, and ultimately filed, in November 2005, an EEO Complaint ("2005 EEO Complaint") with the USPS, alleging that it had discriminated against him based on race (black) and disability (hammertoes and bunions) when it had re-assigned him back to the Maintenance Department.  Plaintiff named in the Complaint, among others, Nick Vendetti, who would later become the BMC's Plant Manager, and Bert Obritsch, Manager of Maintenance.  The USPS, and Mssrs. Dale Bell (his supervisor) and Obritsch in particular, received notice of the 2005 EEO Complaint no later than August 29, 2005, when Plaintiff, in accepting his reassignment, added that he had a "redress (EEO) pending that may have an affect on [that] job offer."

Importantly, Plaintiff later admitted under oath to an Administrative Judge ("AJ") that:

> [The 2005] **EEO wasn't about discrimination.**  I went to the plant manager [Nick Vendetti], and I went to Bert Obritsch, which was the maintenance manager . . . and I told them that this was not about discrimination. . . .  I told Mr. Vendetti I do not think he's a racist . . .  **I just want the money for performing the labor that I did.**  That's all I wanted.

Dkt. 46-2 at 23 (emphasis added).

In October 2006, the EEO Commission ("EEOC") dismissed Plaintiff's 2005 EEO Complaint.

---

[2]  During his employment with the USPS, Plaintiff also received training and served, in at least one instance, as a steward for the USPS' employees' union, in which capacity he assisted employees' with their employment complaints (called "grievances").

**B.     Plaintiff Made and Distributed Unauthorized Copies of Correspondence and Other Confidential Documents to Support his 2005 EEO Complaint**.

On or about August 21, 2006, in responding to the EEOC AJ's notice of intent to dismiss his 2005 EEO Complaint without a hearing, Plaintiff submitted to the EEOC photocopies of three types of documents.  First, Plaintiff photocopied and submitted correspondence and the cover of a technical specification addressed from a third party to USPS independent contractor Theodore Tolle.[3]  Second, Plaintiff photocopied and submitted financial and insurance information received from other third party contractors.  Third, Plaintiff photocopied and submitted the front cover of sealed U.S. Mail envelopes addressed from third parties to WAIPS or Mr. Tolle.

Shortly thereafter, Plaintiff submitted a second similar set of documents to the EEOC AJ, including copies of the cover of two U.S. Mail envelopes to Mr. Tolle from a third party or the USPS.

Plaintiff has admitted that he made and submitted the photocopies of these documents, not in furtherance of his duties as a clerk, but only to support certain factual elements of his 2005 EEO Complaint.

Additionally, and perhaps more importantly, Plaintiff has admitted under oath the following:

• "Okay . . . I'm guilty of photocopying it."  Dkt. 46-2 at 14.

• "Now, was I right?  No, I was wrong for making the copies . . . ."  *Id.* at 19.

• "Well, yeah, I violated a rule.  Yes, I did.  Because I could have asked for that information, and I didn't."  Dkt. 46-3 at 12-13.

• "During the discovery portion of [his 2005 EEO Complaint], I had the right to information; however, I didn't go about getting it right."  Dkt. 46-2 at 16.

• "Did I know should I have asked [before photocopying documents], your Honor?  Well, I - - yeah, I knew I should have asked, but I didn't . . . ."  *Id.* at 20.

In other words, the evidence will show that Plaintiff has admitted that he (a) made the photocopies, (b) without authorization, (c) knowing that doing so was "wrong" and in violation of USPS' rules, (d) knowing that there were other ways to obtain that information, and (e) knowing that he should have sought authorization.

//

---

[3]  Mr. Sherman was aware that Mr. Tolle was not a USPS employee before making those photocopies.

1    Furthermore, Plaintiff has also admitted that, prior to making the referenced photocopies, he had

2    signed statements agreeing to protect the sanctity of the mail in his custody and to protect the

3    confidentiality of any documents in his possession.  Specifically, upon being hired, Plaintiff

4    acknowledged that it was his duty to "preserve and protect the security of all mail in [his] custody from

5    unauthorized opening, inspection, tampering, delay, reading of the contents or covers, or other

6    unauthorized acts."  Dkt. 46-3 at 15 ("Statement") (emphasis added).  Additionally, in accepting his

7    prior positions, Plaintiff agreed that, without limitation, the "confidentiality of all communications and

8    correspondence sent and received by this office must be adhered to."  Dkt. 46-2 at 1& 4 (together the

9    "Job Offers") (emphasis added).

10    **C.    Plaintiff's December 2006 Removal**.

11    In addition to mailing the photocopies to the AJ, Plaintiff mailed the photocopies to the USPS

12    counsel assigned to the 2005 EEO Complaint, Melinda Varszegi.  Ms. Varszegi advised USPS

13    management of her receipt of these documents, asking how Plaintiff had received them.  Management

14    then referred the matter to the USPS-OIG.  In its final report, the OIG concluded that it could not

15    determine whether there was theft or rifling of those documents, but did conclude that Plaintiff "did use

16    the postal documents for his personal business" and referred the matter back to management to conduct

17    their own investigation and potentially to take administrative action.

18    Upon receipt of the OIG report, Plaintiff's immediate supervisor, Dale Bell, decided to

19    determine the facts on behalf of the USPS and to conduct a thorough investigation, which would also

20    allow Plaintiff to tell his side of the story.  Mr. Bell's investigation began on October 4, 2006 with the

21    first of three interviews of Plaintiff.

22    Following the final interview, Mr. Bell determined that removal was warranted and issued to

23    Plaintiff a Notice of Proposed Removal ("Notice") on November 2, 2006.  The Notice was signed and

24    approved by Mr. Bell's supervisor, Mr. Obritsch.  The Notice charged Plaintiff with an "Ethics

25    Violation: Unauthorized Photocopying of Official Documents for Personal Use/Gain."  Citing the

26    Statement and the Job Offers as well as other USPS policies, Mr. Bell had determined that Plaintiff had

27    submitted photocopies of USPS documents to persons outside the USPS, for personal gain (to support

28    his EEO complaint), without authorization, which resulted in a breach of confidentiality of those

documents.  Mr. Bell explained and will testify that he could no longer trust him to work with the mail stream and to properly handle information that would come to him in the course of his duties.  Plaintiff went on administrative leave starting on November 2, 2010.

Plaintiff responded in writing to the Notice on November 18, 2006, asking only that the proposed removal be reduced to a less severe punishment.  Plaintiff has admitted that some corrective action was "absolutely" warranted; he contested only the level of punishment.  Dkt. 46-1 at 37-38.

On November 30, 2006, the USPS, through BMC Plant Manager Nick Vendetti, issued to Plaintiff a Letter of Decision affirming the Notice's Proposed Removal ("2006  Removal").  Mr. Vendetti found and will testify that Plaintiff's supervisors had lost trust in him and that his actions struck "at the core" of the USPS' mission.  Plaintiff's First Removal was effective December 8, 2006.

Mssrs. Bell, Obritsch and Vendetti were the only Deciding Officials in the 2006 Removal and will testify that the only reason that they decided to terminate Plaintiff was because he violated the USPS' rules by the photocopying and distribution of third party correspondence, confidential documents, and mail covers, and the lack of trust resulting therefrom.  Each further will testify that the fact that Mr. Sherman had previously filed an EEO (naming Mssrs. Obritsch and Vendetti, but not Bell) played no part in their decision.

**D.  Subsequent Events:  Plaintiff's 2006 Removal Reduced to a 14-day Suspension, His Resignation, and His Second Removal for Unemployment Fraud.**

Plaintiff timely filed (1) a grievance with his union ("Union Grievance") in December 2006, and (2) a second EEO Complaint of Discrimination with the USPS ("2007 EEO Complaint") on or about February 2, 2007, both challenging the 2006 Removal.  Plaintiff's 2007 EEO Complaint alleged that the USPS had discriminated against him in reprisal/retaliation for his prior EEO activity (*viz.*, for his 2005 EEO Complaint) by issuing the 2006 Removal.

On or about March 9, 2007, Plaintiff's Union Grievance was settled, pursuant to which the 2006 Removal was reduced to an unpaid 14-day suspension, the second highest penalty short of termination.  The Settlement was admittedly based, not on the merits, but only on a "technicality," namely, USPS Labor Relations' failure to timely meet with union representatives on the Union Grievance.

//

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101-1271

1    In addition to formal reinstatement, pursuant to the Settlement, Plaintiff received backpay and

2    forward pay "from December 25, 2006 through his return to work."  After much back and forth, Plaintiff

3    accepted a job offer in February 2008.  Plaintiff then immediately took various forms of paid leave

4    through approximately June 2008, although he had been cleared by his physician to work on March 17,

5    2008.  On June 17, 2008, Plaintiff informed the USPS that he would never return to work again because

6    he was disabled.  Thus, Plaintiff received pay at his previous level from his reinstatement (on or about

7    March 9, 2007) through approximately June 2008, although he physically had not returned to work since

8    November 2, 2006.

9    Concurrently, Plaintiff applied for unemployment benefits on or about December 7, 2006.

10   Although initially denied, on or about March 5, 2007, Plaintiff was awarded unemployment benefits for

11   the period of unemployment from approximately December 23, 2006 through approximately June 16,

12   2007.  In other words, Plaintiff was simultaneously receiving his full salary from the USPS and

13   unemployment benefits from approximately March 12, 2007 through June 2007.

14   Accordingly, on June 20, 2008, the State of Washington's Office of Administrative Hearing for

15   the Employment Security Department ("OAH-ESD"), after a hearing, concluded that Plaintiff was at

16   fault in causing the overpayment.  During this process, Plaintiff admitted he engaged in this fraud

17   because "he was angry."  At the referral of the OAH-ESD, Plaintiff was convicted in Pierce County

18   Superior Court for First Degree Theft, a crime punishable by imprisonment in excess of one year under

19   Washington State law.

20   In turn, on October 28, 2008, the USPS issued Plaintiff a second Notice of Proposed Removal,

21   which was approved by a Letter of Decision dated January 15, 2009 and effective January 23, 2009.

22   ("Second Removal").   Plaintiff has appealed his Second Removal to the Merit Systems Protection

23   Board, which remains pending.

24   **E.    Plaintiff's Evidence of Retaliation.**

25   At trial, Plaintiff will offer no direct evidence that his 2006 Removal was motivated by his 2005

26   EEO Complaint.  Instead, Plaintiff will rely on circumstantial evidence which, in a nutshell, consists

27   only of his belief that there can be no other explanation for the removal but reprisal.  Specifically, he has

28   admitted he never spoke to any of the Deciding Officials about whether they were "upset" at Plaintiff for

DEFENDANT'S TRIAL BRIEF – 8
(C08-1533-RAJ)

1   filing his 2005 EEO.  He further has admitted that no one in his union informed him that the 2005 EEO

2   was the reason for the First Removal.  He further has conceded that he has no documents which or

3   witnesses who will corroborate his claim.  Finally, Plaintiff will not be able to point to any comparators,

4   *i.e.*, he does not know of any other employee who was accused of a similar infraction who was not

5   terminated.

## III.  LEGAL ARGUMENT

### A.     General Standard for Retaliation Claims.

8          Title VII contains no express anti-retaliation provision applicable to federal employers.

9   However, courts, including the Ninth Circuit, have held that Title VII's prohibition against retaliation

10  imposed on private employers applies to federal employers as well.  *See White v. GSA*, 652 F.2d 913,

11  916-17 (9th Cir. 1981); *see also* 29 C.F.R. § 1614.101.

12         A three-part system of shifting burdens (sometimes referred to as the "*McDonnell Douglas*"

13  scheme) governs retaliation claims.  *See Bergene v. Salt River Agr. Imp. & Power District Project*, 272

14  F.3d 1136, 1140 (9th Cir. 2001).  As to the first part, "[t]he plaintiff bears the initial burden of

15  establishing a prima facie case."  *Id.* at 1141.  In order to make out a *prima facie* case of retaliation, an

16  employee must show that (1) he engaged in protected activity; (2) his employer subjected him to an

17  adverse action; and (3) a causal link exists between the protected activity and the adverse action.  *See*

18  *Vasquez v. County of Los Angeles*, 349 F.3d 634, 646 (9th Cir. 2003); *Ray v. Henderson*, 217 F.3d 1234,

19  1240 (9th Cir 2000).

20         If a plaintiff does make such an initial showing, in the second part, the burden <u>of production</u> then

21  shifts to the defendant to produce evidence that it took the particular employment action at issue for a

22  legitimate, non-retaliatory reason.  *See Bergene*, 272 F.3d at 1141.  An employer satisfies the burden of

23  production by introducing evidence which, "*if believed by the trier of fact*," would support a finding that

24  there was a non-retaliatory reason for the challenged personnel action.  *See St. Mary's Hon. Ctr v. Hicks*,

25  509 U.S. 502, 507 (1993) (emphasis in original) (citation omitted) (noting that "[t]he ultimate burden of

26  persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at

27  all times with the plaintiff.").  Furthermore, the "determination that a defendant has met its burden of

28  production (and has thus rebutted any legal presumption of intentional discrimination) can involve <u>no</u>

DEFENDANT'S TRIAL BRIEF – 9
(C08-1533-RAJ)

1    credibility assessment." *Id*. at 509 (emphasis added); *see also Fuentes v. Perskie,* 32 F.3d 759, 763 (3d

2    Cir. 1994) (defendant "need not prove that the tendered reason actually motivated [his] behavior, as

3    throughout this burden shifting paradigm the ultimate burden of proving intentional discrimination

4    always rests with the plaintiff"); *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007) ("The

5    employer's burden is only one of production, not persuasion, and involves no credibility assessment.").

6          In the third and final part, if the employer does satisfy his burden of production, the burden then

7    shifts back to plaintiff to establish that the employer's explanation is merely a pretext for unlawful

8    retaliation.  *See Bergene*, 272 F.3d at 1141.  "Although a plaintiff may rely on circumstantial evidence

9    to show pretext, such evidence must be **both specific and substantial**."  *See Villiarimo*, 281 F.3d at

10   1062 (*citing Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998)) (emphasis added).  As

11   this Court itself has recently held, "Speculation and belief are insufficient to create a fact issue as to

12   pretext.  Nor can pretext be established by merely conclusory statements of a plaintiff who feels that he

13   has been discriminated against."  *See Richards v. City of Seattle*, No. 07-CV-1022-TSZ, 2008 WL

14   2570668, at * 9 (W.D. Wash. June 26, 2008) (citations omitted).

15         Moreover, and importantly, "In examining pretext, the question is whether the employer

16   honestly believed its proffered reason. . . .  The fact that the employer was mistaken or based its decision

17   on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is

18   pretextual. . . . [plaintiff] must present evidence that [defendant] is insincere. . . ."  *See Essex v. United*

19   *Parcel Serv., Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997) (emphasis added); *Villiarimo v. Aloha Island*

20   *Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) ("courts only require that an employer honestly believed

21   its reason for its actions, even if its reason is foolish or trivial or even baseless") (citation omitted)

22   (emphasis added); *see also Ruby v. Springfield R-12 Pub. Sc. Dist.*, 76 F.3d 909, 911 n.7 (8th Cir. 1996)

23   (the only question is whether employer gave "honest explanation of its behavior, rather than to weigh

24   the wisdom of any particular employment decision; Title VII does not authorize federal courts to sit as a

25   super-personnel department that reexamines an entity's business decisions").

26         Ultimately, and of primary importance, a plaintiff must show by a preponderance of evidence

27   that "but for" the fact that he engaged in protected activity the adverse actions of which he complains

28   would not have occurred.  *See Villiarimo*, 281 F.3d at 1064-65.

1    **B.**    **Plaintiff Will Fail To Make His Case in Chief.**

2         **1.**    **Plaintiff will fail to make a *Prima Facie* Case of Retaliation.**

3         Defendant does not contest that Plaintiff was subjected to an adverse action, *i.e.*, the removal in

4    December 2006.  As a preliminary matter, it is important to note that the December 2006 Removal is the

5    only claim that Plaintiff has properly exhausted, brings in this action, and may recover upon.  Dkt. 29.

6    All other potential claims from his 2005 EEO or his Second 2009 Removal are not before this Court.  *Id.*

7    Likewise, as will be explained further below, the allegedly "related bad acts" that Plaintiff will introduce

8    at trial are not properly before this Court.

9         More immediately, at trial, Defendant will argue that Plaintiff has failed to make a *prima facie*

10   case of retaliation for two reasons: (1) Plaintiff cannot show that he was engaged in "good faith" in a

11   protected activity, and (2), in the absence of *additional* "specific and substantial" evidence, the time

12   between the 2005 EEO Complaint and the 2006 Removal is too attenuated to permit this Court to find

13   the required causal link, even at the *prima facie* stage.

14        **a.**    **Plaintiff's 2005 EEO Complaint was not in "good faith."**

15        This Court already has held correctly that "Title VII's anti-retaliation provision protects both

16   opposition to unlawful practices in general and, more specifically, the use of EEOC proceedings or other

17   legal process to oppose those practices."  Dkt. 66 at 4 (citing 42 U.S.C. § 2000e-3(a) and acknowledging

18   the distinction between "opposition" and "participation" proceedings).  However, that protection is

19   limited in the following way, as this Court explained:

20        When an employee's purportedly protected activity falls within the opposition
          clause, he must have a 'reasonable belief' that the employer engaged in a practice that
21        Title VII makes unlawful.  *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994).  A court
          must judge whether an employee's belief is reasonable 'according to an objective
22        standard - one that makes due allowance, moreover, for the limited knowledge possessed
          by most Title VII plaintiffs about the factual and legal bases of their claims.'  *Id.* at 985.
23        Even a mistaken belief that a practice is unlawful will suffice, so long as the employee
          made the mistake in good faith.  *Id.* at 984.  Whatever 'good faith' means in this context
24        in the Ninth Circuit, the Supreme Court [in *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268
          (2001)] has held that **a sincere but objectively unreasonable belief does not suffice**.

25   Dkt. 66 at 4 (emphasis added).  The Court added that "the mere fact that the practice the employee

26   opposes is unlawful is insufficient, it must be a practice that *Title VII* makes unlawful."  *Id.* (citing

27   *Learned v. City of Bellevue*, 860 F.2d 928, 930 (9th Cir. 1988)) (emphasis in original).

28

1    Moreover, and crucially, this Court correctly further found that "A similar standard applies to

2    those who invoke the participation clause." Dkt. 66 at 5.  Specifically, this Court rightly held that:

3        The 'mere fact that an employee is participating in an investigation or proceeding involving
         charges of some sort of discrimination' does not 'automatically trigger' Title VII's antiretaliation
4        provision.  Instead, **the employee must produce evidence that the proceeding in which he is
         participating raises a 'valid Title VII claim.'**  A 'valid' claim in this context is not necessarily
5        one on which the employee ultimately prevails.

6    Dkt. 66 at 5 (citing *Learned*, 860 F.2d at 930) (emphasis added).  In other words, a plaintiff needs to

7    produce evidence that the proceeding in which he is participating raises a "valid Title VII claim," in

8    order to show that he had  "an objectively reasonable belief" that he was engaging in protected activity.

9    This is "good faith." [4]

10       Courts in the Seventh, Tenth and Eleventh Circuits have similarly held.  *See Fiscus v. Triumph*

11   *Group Operations*,  24 F. Supp. 2d 1229, 1241 (D. Kan. 1998) (citing *Dey v. Colt Const. &*

12   *Development Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994)); *see also Neely v. City of Broken Arrow*, 2007

13   WL 1574762 (N.D. Okla. 2007); *Amos v. Housing Authority of Birmingham Dist.*, 927 F. Supp. 416,

14   422 (N.D. Ala. 1996) (in precluding a retaliation claim, holding "[Title VII] shields an employee from

15   retaliation regardless of the merit of her complaints so long as she can show a good faith, reasonable

16   belief that the challenged practices violate Title VII.") (emphasis added) (citing *Rollins v. State of Fla.*

17   *Dept. of Law Enforcement*, 868 F.2d 397 (11th Cir. 1989)).

18       As this Court is well aware, during a hearing in 2007, Plaintiff admitted, without qualification,

19   that his 2005 EEO Complaint "was not about discrimination," but just for "the money."  Dkt. 46-2 at 23.

20   As this Court found, during that hearing, Plaintiff "did not suggest that he had a valid claim of disability

21   discrimination."  Dkt. 66 at 7.  Only after this Court granted summary judgment in favor of Defendant

22   based on these and other similar admissions, did Plaintiff submit two (facially inconsistent) declarations

23   to assert for the first time that he did believe that he was the victim of, at least, disability discrimination.

24   Dkt. Nos. 69 and 79; *see also* Dkt. 81 at 2 (this Court notes that Plaintiff "appears to have changed his

25

26   [4] This is the law of this case.  As this Court knows, Plaintiff filed a motion for reconsideration providing other
     evidence to create a factual dispute on this issue.  Dkt. 68.  Although he had the opportunity thrice to do so (in his
27   original Opposition to Defendant's Summary Judgment Motion, in his Reconsideration Motion, and in his Reply
     to the USPS' Opposition to his Reconsideration Motion), Plaintiff to date has never challenged the validity of the
28   case law Defendant adduced, never offered any contrary legal authority, and never questioned the legal basis of
     this Court's original ruling.  Defendant submits that, as a matter of procedural fairness, it is now too late to do so.

DEFENDANT'S TRIAL BRIEF – 12
(C08-1533-RAJ)

1   mind" about whether he thought he had been subject to racial discrimination).  This Court recognized

2   that "it is [] possible that Mr. Sherman is changing his story to survive summary judgment," but held

3   that it was for the fact finder at trial to decide.  Dkt. 81 at 3.

4        The evidence will show that this Court should not believe Plaintiff's contortions and, regardless,

5   that Plaintiff cannot prove, by the preponderance of the evidence, that the 2005 EEO proceeding raised a

6   "valid Title VII claim" of disability discrimination.  Thus, Plaintiff cannot show that he had "an

7   objectively reasonable belief" that he had a valid Title VII claim, *i.e.*, that he was engaging in "good

8   faith" protected activity.  On the contrary, Defendant respectfully submits that Plaintiff's actions are a

9   blatant and paradigmatic example of abusing the EEO process and undermine this nation's hard fought

10  civil rights laws.  Plaintiff's actions are particularly egregious, as he was an EEO Advisor with the

11  Army and a USPS Union Steward (Dkt. 46-2 at 25-27, 32 & 36), and did not have the "limited

12  knowledge possessed by most Title VII plaintiffs about the factual and legal bases of their claims."

13  *Mayo*, 40 F.3d at 985.

14       Finally, Defendant reminds the Court that a case in the Eleventh Circuit (*Amos*) is on all fours.

15  Plaintiff Amos was a probationary employee of a state agency ("HABD"), who was passed over for a

16  permanent position.  *See Amos*, 927 F. Supp. at 417.  Ms. Amos was "admittedly experienced and highly

17  knowledgeable in personnel and EEO matters from her prior academic training and extensive job

18  experience, and at the time she was passed over she had already been assigned, as one of her duties at

19  HABD, the important responsibility for responding to all EEO complaints." *Id.*  Nonetheless, Ms. Amos

20  "promptly charged over to the EEOC . . . [w]here she filed a charge of age discrimination against

21  HABD." *Id.*  In *Amos*, the plaintiff claimed that she was the victim of retaliation in the form of a

22  discharge in reaction to her having filed a charge with the EEOC.  *Id.* at 418.  The district court found

23  that the plaintiff had voluntarily conceded that "her original claim of age discrimination was baseless."

24  *Id.* at 418 & 421 ("totally devoid of merit").  The court further found that "[w]hen she went running to

25  the EEOC, she was transparently motivated by frustration and anger." *Id.* at 421.  In turn, the Court

26  found that "[w]hen a person skilled in human relations and trained to defend EEOC charges, makes a

27  claim that has no logical basis, that claim could not have been made in good faith or upon a reasonable

28  belief that it is meritorious." *Id.* at 422.  The district court found this fact "crucial and dispositive" and,

1  thus, held that plaintiff's activity is "outside the protection of the statute," *i.e.*, not protected activity.  *Id.*

2  at 421-422.

3  As in *Amos*, Plaintiff here should not be rewarded with a viable claim for knowingly abusing the

4  EEO process.

#### b.   The time between the August 2005 EEO and the December 2006 Removal is too attenuated to establish a causal connection.

5

6

7  The Supreme Court has held that a court may infer causation (sufficient to establish a plaintiff's

*prima facie* case) merely from temporal proximity between the protected activity and adverse action, if

8

and only if the time between the employer's knowledge of the protected activity and the adverse action

9

is "very close."  *See Clark County School District v. Breeden*, 532 U.S. 268, 273-74 (2001) (positively

10

citing cases that held that three and four month periods respectively were too long).  In applying

11

*Breeden*, the Ninth Circuit similarly has held that nine months between the date of a plaintiff's allegedly

12

protected activity and an employer's allegedly adverse decision was too long to permit an inference of

13

causation.  *See Manatt v. Bank of America*, 339 F.3d 792, 802 (9th Cir. 2003) ("such an inference is <u>not</u>

14

<u>possible</u> in this case because approximately nine months lapsed") (emphasis added).  Thus, the *Manatt*

15

Court concluded that "the evidence suggests no causality at all."  *Id.*; *Villiarimo*, 281 F.3d at 1065

16

(adverse action must follow "<u>on the heels</u>" of the protected activity) (emphasis added).

17  Moreover, for timing/causal purposes, the "trigger" is the protected activity and the "end-point"

18

is <u>the adverse action upon which he seeks relief</u>.  *See, e.g., Breeden*, 532 U.S. at 273-74 (using the

19

adverse action upon which plaintiff sought relief as the end-point); *Manatt*, 339 F.3d at 802 (same).

20  At trial, the evidence will show that Plaintiff first contacted the EEO in August 2005, requested

21

mediation in September 2005, and filed his formal EEO Complaint in November 2005.  The USPS

22

received notice of the 2005 EEO Complaint no later than August 29, 2005, when Plaintiff, in accepting

23

the 2005 Job Offer, added that he had a "redress (EEO) pending."  The allegedly retaliatory First

24

Removal, however, was not proposed until November 2006, nearly <u>16 months</u> after the allegedly

25

protected activity was initiated and over year from the formal filing.  Indeed, the 2005 EEO Complaint

26

was dismissed in October 2006, *prior to* the allegedly retaliatory First Removal.

27  //

28

1   The USPS will argue that too much time had passed between Plaintiff's August 2005 EEO

2   Complaint (or even the USPS' knowledge of the protected activity) and the November 2006 Removal to

3   infer a causal connection.  In turn, Plaintiff has not met and cannot meet, without additional "specific

4   and substantial" causal evidence, the final element of even his *prima facie* case.

5               **2.  The USPS will show it had a non-retaliatory reason for terminating Plaintiff.**

6   At trial, the USPS will show that it had a consistent, legitimate, non-retaliatory reason for its

7   decision to terminate Plaintiff, namely: "Ethics Violation: Unauthorized Photocopying of Official

8   Documents for Personal Use/Gain."  In other words, Plaintiff violated numerous USPS policies,

9   including his own signed and sworn statements, by making unauthorized photocopies of confidential

10  information and other documents for his personal use.  Further, Defendant will show that Plaintiff

11  inspected, tampered, delayed (even if minimally) and read the content and covers of the documents

12  copied, also in violation of USPS policy.  Finally, each Deciding Official will testify in his own way that

13  Plaintiff's actions struck "at the core" of the USPS' mission and that the fact that Plaintiff had

14  previously filed an EEO played no part in their decision.

15  It is important to restate the "determination that a defendant has met its burden of production

16  (and, thus, has rebutted any legal presumption of intentional discrimination) can involve <u>no credibility</u>

17  <u>assessment</u>."  *See Hicks*, 509 U.S. at 509 (emphasis added).  A defendant's burden is one of production,

18  not persuasion.  *McCoy*, 492 F.3d at 557.

19  It is important to further note that an employer does not lose the ability to review an employee's

20  conduct and, if necessary, discipline the employee, merely because the employee has filed a

21  discrimination claim.  *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir.

22  1989).  An employee is not protected under the law when he violates legitimate rules and orders of his

23  employer, disrupts the employment environment, or interferes with the attainment of his employer's

24  goals.  *Id.*; *see also Brown v. Ralston Purina Co.*, 557 F.2d 570, 572 (6th Cir. 1977) (filing

25  discrimination suit does not create right to miss work, fail to perform assigned work, or leave work

26  without notice); *Hochstadt v. Worcester Found. for Experimental Biology*, 545 F.2d 222, 230 (1st Cir.

27  1976) (employee does not enjoy immunity from discharge for misconduct merely by claiming that at all

28  times she was defending rights of her sex).

1    The Ninth Circuit's decision in *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756,

2    763-64 (9th Cir. 1996), is factually similar and instructive in this regard.  In *O'Day*, in opposing what

3    the plaintiff claimed was unlawful conduct, the plaintiff without authorization searched for, obtained

4    and copied confidential documents and then showed those wrongly obtained documents to a co-worker.

5    *Id.*  The Ninth Circuit found that the statute (there, the ADEA) did not protect the plaintiff from being

6    legally discharged for his misconduct.

7    Similarly here, Plaintiff has admitted that he acted improperly and Defendant will show that it

8    disciplined him solely for that reason.  That showing should be sufficient to shift the burden back to

9    Plaintiff.

10    **3.  Plaintiff will be unable to establish that the USPS' reasons were pretextual.**

11    To establish pretext, Plaintiff must present evidence that Defendant "did not honestly believe its

12    proffered reasons" and that "but for" the 2005 EEO Complaint the termination would not have occurred.

13    *See Villiarimo*, 281 F.3d at 1063 & 1064-65 (citations omitted).  Plaintiff must establish pretext either

14    indirectly with circumstantial evidence or directly through evidence of retaliatory animus that needs no

15    "inference or presumption."  *See Block v. Solis*, No. 08-cv-1850-JLR, 2010 WL 2079688 at *14 (W.D.

16    Wash., May 20, 2010) (citations omitted).  Again, if a plaintiff will rely on circumstantial evidence, such

17    evidence must be "specific and substantial."  *See Villiarimo*, 281 F.3d at 1062.  As this Court has held,

18    "pretext [cannot] be established by merely conclusory statements of a plaintiff who feels that he has

19    been discriminated against."  *See Richards*, 2008 WL 2570668 at *9.

20    Here, Plaintiff will not present any direct evidence, either in the form of admissions, documents,

21    or witnesses.  Plaintiff further has no circumstantial evidence that is remotely "specific and substantial"

22    enough to prevail at trial.  The only true evidence Plaintiff will proffer is his "belief" that there could be

23    no other explanation for his First Removal but retaliation, which evidence is paradigmatically legally

24    insufficient.

25    Plaintiff may attempt to argue that the USPS did not follow its own regulations in investigating

26    or disciplining Plaintiff, or that the USPS cannot show the documents Plaintiff copied were each and all

27    "U.S. Mail," or that the deciding officials mistakenly believed the documents were "U.S. Mail," or that

28    his punishment was unduly harsh.

1    In response, first, as a legal matter, it is important to further note that, as this Court previously

2    found in another case, "The Court's function in a case of this nature is not to second-guess the

3    employer's interpretation of its policies and regulations, but rather to assess whether sufficient evidence

4    of discriminatory or retaliatory behavior has been presented to warrant a trial." *Richards*, 2008 WL

5    2570668 at *10.   As in *Richards*, Plaintiff will not be able to make "the requisite showing; he does not

6    dispute the wrongdoing that led to his suspension, and he offers no evidence that similar misconduct by

7    non-protected employees has been less harshly punished." *Id.*

8    Second, Defendant will show that USPS did in fact act consistent with its own policies.  In

9    particular, Defendant will explain that Article 16, upon which Plaintiff will rely, states flatly that "'Just

10   cause' is a 'term of art' **created by labor arbitrators**.  **It has no precise definition.  It contains no**

11   **rigid rules** that apply in the same way in each case of discipline or discharge." *See* Dkt. 57-17 at 2

12   (emphasis added).

13   Plaintiff may also try to show that the USPS acted inconsistently towards other USPS employees

14   who it claims committed more egregious acts, namely, members of a mail theft ring.  In response, first,

15   it is the *Plaintiff's burden*, not the USPS', to show that similar misconduct by non-protected employees

16   has been less harshly punished, because he has the burden of persuasion at all times.  *See St. Mary's*

17   *Hon. Ctr.*, 509 U.S. at 507.  Second, USPS will show that it terminated every perpetrator of the mail

18   theft ring, although some may have retired prior to the effective date of the termination.  Regardless, the

19   mail theft ring is not is not identical to Plaintiff's conduct.  Plaintiff's conduct was so unusual and

20   patently wrong that the USPS could not locate and will not present an identical situation.

21   Thus, Plaintiff will not be able to show either that Defendant did not honestly believe its own

22   proffered reasons or the necessary "but for" connection.  USPS will show that, if Defendant had

23   photocopied and distributed documents for any personal reason, it would have taken the same action.  In

24   turn, Plaintiff cannot show pretext.

25       **C.    Other Outstanding Legal Disputes.**

26           **1.  Plaintiff's Allegedly "Related Bad Acts" are Not Properly Before this Court.**

27   In the parties' Proposed Pre-Trial Order, Plaintiff has identified the following allegedly "related"

28   adverse employment actions, which he claims shows a pattern of retaliatory conduct and which he seeks

1   to recover damages upon: "creating a hostile work environment" and "efforts to deny him

2   unemployment benefits." *See* Dkt. 101 at 5, Plaintiff's Factual Contentions Nos. 2-3 & 17.  As to the

3   former, Plaintiff alleges that USPS "placed improper restrictions on Mr. Sherman's working conditions"

4   (such as restricting his lunch hour, his parking privileges, and his freedom of movement); "repeatedly

5   interview[ed] him in an effort to take adverse action against him;" "posted Mr. Sherman's picture at the

6   BMC entrance as a warning against filing EEO Complaints to other USPS employees;" and offered him

7   a job inconsistent with his limitations.  *Id.* at Nos. 3, 16, & 18.

8          In its Order of August 31, 2011, this Court disagreed with Defendant's assertion that Plaintiff

9   failed to exhaust his administrative remedies with respect to "related bad acts."  Dkt. 87 at 2-3.  The

10  Court stated that while "*National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002), places

11  limitations on which acts occurring prior to an EEOC charge can fall within the scope of that charge,"

12  those "limitations do not, however, apply to acts like the ones Mr. Sherman hopes to raise, which

13  occurred *after* he filed his EEOC charge."  Dkt. 87 at 3 (emphasis in original).  For the reasons

14  explained below, Defendant respectfully submits that the Court's prior understanding of the exhaustion

15  requirement is not completely accurate and asks the Court to revisit its prior decision, particularly

16  because the issue was never fully briefed and Plaintiff had not previously put before the Court which

17  "related bad" acts he was seeking to recover for.[5]

18         Prior to 2002, claims not timely raised in an administrative EEO complaint could still be pursued

19  if the claims were like or related to claims that were timely filed.  This exception applied to claims

20  alleging (1) new discrete acts of alleged discrimination or retaliation; (2) further acts of harassment

21  contributing to a hostile environment even if the individual acts were not separately actionable; and (3) a

22  different discriminatory basis from that raised in the exhausted EEO complaint.  In 2002,

23  however, the Supreme Court of the United States severely limited the like or related exception by

24  ruling that a timely EEO complaint must be filed for each discrete act of retaliation or

25

26         [5] The Court will recall that Defendant first raised this issue in its Partial Motion to Dismiss.  Dkt. 18.
    The Court declined to rule on the issue as it was not ripe.  Dkt. 29.  When this Court reversed its original grant of
27  summary judgment (Dkt. 81), within the constraints of the local rules governing motions for reconsideration,
    Defendant asked this Court to resolve this and other outstanding issues, which were not addressed in its reversal.
28  Dkt. 83.  The Court then ruled as described above based solely upon the briefing in the Partial Motion to Dismiss,
    without asking for full briefing on the issue.  Dkt. 87.  Defendant respectfully requests that this Court consider the
    following briefing when evaluating Plaintiff's "related" claims.

DEFENDANT'S TRIAL BRIEF – 18
(C08-1533-RAJ)

1    discrimination.  *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002) ("Each

2    incident of discrimination and each retaliatory adverse employment decision constitutes a

3    separate actionable 'unlawful employment practice.'").  Accordingly, "discrete discriminatory

4    acts are not actionable if time barred, ***even when they are related*** to acts alleged in timely filed

5    charges." *Id.* at 102, 113 (emphasis added).  The Supreme Court further opined that "strict adherence to

6    the procedural requirements specified by the legislature is the best guarantee of evenhanded

7    administration of law."  *Id.* at 108.

8         The Ninth Circuit has specifically acknowledged that it is "bound to apply current

9    Supreme Court law" and that pursuant to *Morgan* "discrete discriminatory acts are not actionable

10   if time barred, even when they are related to acts alleged in timely filed charges."  *Lyons v.*

11   *England*, 307 F.3d 1092, 1105 (9th Cir. 2002).  In further following *Morgan*, the Ninth Circuit has held

12   that discrete acts must be separately, timely exhausted, even if a plaintiff alleges that the discrete act is

13   evidence of a discriminatory pattern and practice, as Plaintiff may here.  *See Lyons*, 307 F. 3d at 1107.

14   Specifically, in *Lyons*, the Ninth Circuit stated that "[i]f a plaintiff chooses to bring separate claims

15   based on each discriminatory act, his assertion that this series of discrete acts flows from a

16   company-wide, or systemic, discriminatory practice will not succeed in establishing the employer's

17   liability for acts occurring outside the limitations period because the Supreme Court has determined that

18   each incident of discrimination constitutes a separate actionable unlawful employment practice."  *Id.*

19        Specifically applicable to this case is that fact that *Morgan's* exhaustion requirements apply

20   equally to any additional acts of alleged retaliation both before or ***after*** the filing of an EEO complaint.

21   *See Martinez v. Potter*, 347 F.3d 1208, 1210-11 (10th Cir. 2003) (the *Morgan* rule is "equally

22   applicable" to "discrete claims [of retaliation] based on incidents occurring after the filing of Plaintiff's

23   EEO complaint"); *McClendon v. Hewlett-Packard Co.*, 2005 WL 2847224, at *3 (D. Idaho 2005) ("the

24   rule stated in *Morgan* is applicable to claims based on facts occurring both before and after the filing of

25   an administrative claim"); *Romero-Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 149 (D.D.C. 2005)

26   ("Although *Morgan* bars recovery for, on its facts, discrete acts occurring before the statutory time

27   period, ***Morgan* has, on the whole, been understood to also bar discrete acts occurring after** the

28   time period, after the filing of an administrative complaint, when a plaintiff does not file a new

DEFENDANT'S TRIAL BRIEF – 19
(C08-1533-RAJ)

1   complaint or amend the old complaint but instead presents these acts for the first time in federal court.")

2   (emphasis added).  Accordingly, because they were not separately exhausted, Defendant respectfully

3   submits that the "related bad acts" alleged by Plaintiff are not properly before this Court as substantive

4   claims upon which Plaintiff can recover damages.[6]

5         **2. There is no Collateral Estoppel from Plaintiff's Unemployment Benefits Hearing.**

6        In his Trial Brief, Plaintiff may claim that the Court should find that the USPS is barred by

7   principles of res judicata or issue preclusion from contending that it had good cause to terminate Mr.

8   Sherman because it already litigated this issue before Administrative Law Judge Benjamin Kingsley.  It

9   is well established, however, that "Congress did not intend unreviewed state administrative proceedings

10  to have preclusive effect on Title VII claims."  *University of Tennessee v. Elliott*, 478 U.S. 788, 796

11  (1986).  As the Ninth Circuit has explained when discussing the Supreme Court's decision in *Elliott*:

12       The clear teaching of *Elliott* is that in a Title VII action a prior state decision enjoys issue
    preclusive effect only if rendered or reviewed by a court.  Under either of those
13       circumstances, 28 U.S.C. § 1738 applies by its own terms.  In contrast, unreviewed
    administrative determinations lack preclusive effect in a subsequent Title VII action,
14       regardless of any preclusive effect state law might accord to them.  Section 1738 does not
    apply to such determinations, and the Court in *Elliott* refused to fashion a federal
15       common-law rule of preclusion in the Title VII context.

16  *McInnes v. California*, 943 F.2d 1088, 1093-94 (9th Cir. 1991).

17       Numerous courts have applied the Supreme Court's holding in *Elliott* to exactly the same

18  situation before the Court here; specifically, to prevent Title VII plaintiffs from applying a preclusive

19  effect to findings made by state unemployment agencies.  *Hicks v. Floyd Cty Bd. Of Educ.*, 99 Fed.

20  Appx. 603, 605 2004 WL 1098744, at *2 (6th Cir. 2004) (refusing, in Title VII case, to give preclusive

21  effect to Kentucky unemployment insurance commission's determination that employee had been

---

22

23       [6] Even if these claims were exhausted and properly before this Court, Plaintiff also cannot show that he
    suffered an "adverse action" as a result of these allegedly bad acts.  For retaliation claims, an adverse action is
24  something that a reasonable employee would find "materially adverse, which in this context means it well might
    have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *See Burlington
25  Northern and Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (citations omitted) (emphases added).  Moreover,
    "The anti-retaliation provision [in Title VII] protects an individual not from all retaliation, but from retaliation
26  that produces an injury or harm."  *Id.* at 67.  In other words, Title VII does not set forth "a general civility code
    for the American workplace" and even facially protected activity "cannot immunize that employee from those
27  petty slights or minor annoyances that often take place at work and that all employees experience."  *Id.* at 68
    (citations omitted).  Each of the alleged "bad acts" do not constitute an "adverse action."  The Court had
28  previously expressed skepticism of such a characterization, with respect to the posting of his picture.  *See* Dkt. 29
    at 4; *see also, e.g., Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009) (being publicly chastised
    by supervisors and ostracized by co-workers not materially adverse).

1    discharged without good cause); *Raines v. Indianapolis Public Schools*, 2002 WL 31688881, at *2 (7th

2    Cir. 2002); *Roth v. Koppers Indus.*, 993 F.2d 1058 (3d Cir. 1993) (refusing to accord issue preclusive

3    effect in favor of the plaintiff to findings of the Pennsylvania Unemployment Compensation Board of

4    Review in Title VII action).  Accordingly, because the OAH-ESD's findings have not been judicially

5    reviewed, this Court should refuse to apply any preclusive effect to its decision.

6         Finally, the issue before the Administrative Judge, in the Judge's own words, was "whether

7    [Plaintiff] was discharged from employment for a willful or wanton disregard of the, rights, title, and

8    interests of the employer . . .," not whether, as Plaintiff has suggested, the USPS "terminated Sherman

9    for just cause."  In any event, neither standard is applicable in this action, which is solely governed by

10   Title VII.

11                    **3.   Limitations to Plaintiff's Claimed Damages**.

12        Plaintiff seeks damages in excess of $2.7 million.  *See* Dkt. 41 at 25.  As this Court is aware,

13   Defendant sought to limit Plaintiff's damages to only those damages suffered from the time the 2006

14   removal was effective (December 8, 2006) until (1) "it was reversed through the union grievance

15   process" (March 9, 2007); (2) the time of his unilateral decision never to return to work in June 2008; or

16   (3) his Second Removal in January 2009, the underlying acts for which he was criminally convicted.

17   *See* Dkt. 45 at 23-24 (citing, as to the first two bases, *Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir.

18   2005) (finding that "short duration of the adverse action was naturally relevant to the degree of damage

19   the plaintiff suffered") and *Satterwhite v. Smith*, 744 F.2d 1380, 1381 n. 1 (9th Cir.1984) (if a plaintiff

20   chooses to leave an agency's employ, he is not entitled to an award after the last date of employment

21   unless constructive discharge is established)).

22        In its order of August 31, 2011, this Court declined to limit Plaintiff's damages prior to trial.

23   Dkt. 87 at 4.  However, the Court did hold that "A factfinder must certainly consider the duration of Mr.

24   Sherman's 'temporary' termination, and it must certainly consider any backpay he received."  *Id.*

25   Similarly, the Court found that "a factfinder will no doubt consider Mr. Sherman's attempt to

26   voluntarily leave his employment in June 2008 for medical reasons to be relevant to any claim for lost

27   wages or benefits."  *Id.*  Finally, per the Court's suggestion, Plaintiff's damages after January 2009 are

28   subject to a pending motion in limine.  *See* Dkt. 94.

1    Defendant respectfully reminds the Court of these findings and alerts the Court that the parties

2    have an agreement that he will not seek backpay from the termination to June 2008, with the exception

3    of the two weeks that he was without pay.  *See* Exhibit 1 hereto.

4    Defendant also respectfully reminds the Court of the following three basic principles of damages

5    law under Title VII.  First, the standard for front pay is a stringent one, inasmuch as reinstatement

6    "should be the norm" and "[f]ront pay is an exceptional award."  *See Sellers v. Mineta*, 358 F.3d 1058,

7    1063-64 (8th Cir. 2004) (disfavoring front pay and noting that it can only be awarded in place of, rather

8    than in addition to, reinstatement.).  Additionally, a victim of discrimination must show either an actual

9    or constructive discharge in order to receive the equitable remedy of reinstatement or front pay in lieu of

10   reinstatement.  *See Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1021 (9th Cir. 2000).  Second, courts

11   will not award lengthy front pay awards when they are too speculative.  *See Hartley v. Dillard's, Inc.*,

12   310 F.3d 1054, 1063 (8th Cir. 2002) (relying on expert testimony to negate speculation and award front

13   pay).  Here, Plaintiff has not pled and cannot begin to show constructive discharge.  At a minimum,

14   Plaintiff cannot make a showing of constructive discharge as a result of the relevant removal (*viz.*, the

15   First Removal) because it was reduced to a 14 day suspension.  Thus, this Court should not award any

16   front pay.  Finally, this Court has already excluded the award of punitive damages (Dkt. 87 at 4-5) and

17   must cap compensatory damages at $300,000.

18                                    **IV.  CONCLUSION**

19   Defendant looks forward to the trial starting on December 5, 2011.  Following the evidence,

20   Defendant respectfully requests the Court grant judgment in favor of Defendant and order that Plaintiff

21   take nothing from this action.

22   //

23   //

24   //

25   //

26   //

27   //

28

1    Respectfully submitted this 22nd day of November, 2011.

2                                    JENNY A. DURKAN
                                     United States Attorney
3

4                                    /s/ J. Michael Diaz
                                     J. MICHAEL DIAZ, WSBA No. 38100
5                                    REBECCA S. COHEN, WSBA #31767
                                     Assistant United States Attorneys
6                                    700 Stewart Street, Suite 5220
                                     Seattle, Washington 98101
7                                    Telephone: (206) 553-7970
                                     Fax: (206) 553-4067
8                                    Email: Michael.Diaz@usdoj.gov
                                     Email: Rebecca.Cohen@usdoj.gov
9
                                     Attorneys for Defendant
10

11

12

13                          **<u>CERTIFICATE OF SERVICE</u>**

14        I HEREBY CERTIFY that on November 22, 2011, I electronically filed the foregoing with the

15   Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

16   following attorneys of record for the Plaintiff:

17
     Jim Howard
18
     Stephanie Beers
19
     DATED this 22nd day of November, 2011.
20

21            s/*J. Michael Diaz*
22            J. MICHAEL DIAZ
              United States Attorney's Office
23

24

25

26

27

28

DEFENDANT'S TRIAL BRIEF – 23
(C08-1533-RAJ)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT 1
TO
DEFENDANT'S TRIAL BRIEF**



**U. S. Department of Justice**

United States Attorney
Western District of Washington

---

*Please reply to:*
*Rebecca S. Cohen*
*Assistant United States Attorney*
*Direct Line: (206) 553-6526*
*rebecca.cohen@usdoj.gov*

*700 Stewart Street, Suite 5220*         *Tel: (206) 553-7970*
*Seattle, WA 98101-1271*                 *Fax: (206) 553-4073*

November 7, 2011

***Via Email and U.S. Mail***

Mr. James Howard, Esq.
Dorsey & Whitney
Columbia Center
701 5th Avenue, Suite 6100
Seattle, WA 98104

   Re: *Sherman v. Potter*, No. 08-1533-RAJ, USDC, W.D. Washington

Dear Jim:

   As we discussed last Thursday, I am writing to confirm our understanding and agreement with respect to the Motions in Limine you filed on October 27, 2011 (Dkt. No. 92). First, with respect to unemployment benefits, it appears that the question of whether the USPS is entitled to offset any potential backpay award by the amount of unemployment Mr. Sherman received is a non-issue. Although we continue to believe that such offsets are permissible because the USPS reimburses the State of Washington for unemployment benefits paid to former USPS employees, we do not believe that Mr. Sherman received unemployment benefits for any period of time for which he could conceivably receive backpay from the Court. Our understanding is that (1) you will not seek backpay for any period of time before July 1, 2008 (except for 14 days in December 2006), and (2) Mr. Sherman did not receive unemployment benefits for either the 14 days in December 2006 or any point after 2007. Given these facts, there would be no need for an offset, even if the Court were to award backpay for some period of time after July 1, 2008.

   Second, as previously noted, we will not argue at trial that if Mr. Sherman is awarded backpay it should be offset by SSI disability benefits. Based on the above, it is our understanding that you will strike your Motions in Limine. Please let us know immediately if any of the understandings articulated in this letter are incorrect, and do no hesitate to contact me if you wish to discuss these issues further.

        Sincerely,

        JENNY A. DURKAN
        United States Attorney

        *Reba S Cohen*
        Rebecca S. Cohen
        Assistant United States Attorney