The Honorable Richard A. Jones

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

LAWRENCE SHERMAN,

Plaintiff,

v.

PATRICK R. DONAHOE[1], in his capacity
as Postmaster General of the United States,

Defendant.

Case No. C08-1533RAJ

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

10

11

12

13

14

15

## I.  INTRODUCTION

16          The court heard this matter in a bench trial that commenced on December 5,

17   2011 and concluded on December 12, 2011.  Plaintiff Lawrence Sherman claims that

18   the United States Postal Service ("USPS") retaliated against him for pursuing a

19   complaint of employment discrimination with the Equal Employment Opportunity

20   Commission ("EEOC").  The court has considered the testimony presented at trial, the

21   exhibits admitted into evidence, and the arguments of counsel.  Being fully advised, the

22   court now makes the following Findings of Fact and Conclusions of Law.  Fed. R. Civ.

23   P. 52(a)(1).

24

25   _____

[1] The court substitutes Patrick R. Donahoe, the Postmaster General of the United States, in
place of his predecessor, John Potter.  Fed. R. Civ. P. 25(d).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1**

## II.  FINDINGS OF FACT

1. Plaintiff Lawrence Sherman is an African-American man who began working for USPS in 1997.  He worked at the Seattle Bulk Mail Center ("BMC"), a facility in Federal Way, Washington, with hundreds of employees.  Mr. Sherman was a member of a labor union.

2. USPS initially assigned Mr. Sherman to work as a custodian within the BMC maintenance department.  Very early in his employment, Mr. Sherman had surgery to correct a back problem.  After the surgery, he was physically limited, particularly in lifting and carrying objects.  Mr. Sherman also has permanent foot-related disabilities.  USPS did not dispute at trial that Mr. Sherman was disabled at all relevant times.

**Findings Regarding Mr. Sherman's EEOC Discrimination Complaint**

3. Following the recommendations of physicians, USPS assigned Mr. Sherman to a less physically demanding position doing clerical work.  Mr. Sherman moved from the first floor of the BMC to the third floor.  Mr. Sherman perceived that there were very few minority employees who worked on the third floor, compared to his work on the first floor.

4. There was conflicting evidence as to whether the clerical work Mr. Sherman did was for the Western Area In-Plant Support ("WAIPS") unit, or for the Western Area Facilities Service Office ("FSO").  The bulk of the evidence, including the letter in which USPS offered Mr. Sherman the clerical position in 2000 (Ex. 8), shows that Mr. Sherman worked for WAIPS.  Mr. Sherman believed that he worked for WAIPS.  Neither WAIPS nor FSO are part of the BMC, although each unit had employees who worked at the BMC.  While Mr. Sherman worked for WAIPS, he continued to be paid from the maintenance department budget.

5. Mr. Sherman was not the only employee reassigned to WAIPS or FSO because of a disability.  There were several other employees who had been reassigned.

At least some BMC employees commonly referred to reassigned employees with disabilities as "rehabs."

6.  Mr. Sherman performed some general clerical work, but soon began assisting with implementing USPS contracts with outside vendors.  Mr. Sherman believed that the work he was performing was above his pay grade, and that his superiors (who were neither African-American nor disabled) were paid more to do essentially the same work.  He performed that work from 2000 until July of 2005.

7.  Mr. Sherman approached an upper-level supervisor in 2003 to discuss his view that he was not being paid enough for the work he was doing.  The supervisor, Pat Starum, told Mr. Sherman that while USPS would reassign rehabs to physically appropriate work, it would not give them a new pay grade or position, even on a temporary basis.  Ms. Starum retired shortly thereafter, and Mr. Sherman asked her replacement about a promotion or pay raise.  Although the new supervisor was willing to consider the request, Mr. Sherman was never promoted or given an increase in pay.

8.  In about March of 2005, Richard Sands and Brian Cao, Mr. Sherman's WAIPS supervisors, informed him that WAIPS was being reorganized.  Mr. Sands and some other WAIPS workers would move to a Seattle facility, and WAIPS administrative work would be centered in Denver, Colorado.  Mr. Sherman continued to wrap up WAIPS work until July 2005.

9.  Mr. Sands or Mr. Cao initially told Mr. Sherman that he would transfer to Seattle with other WAIPS employees.  Shortly thereafter, Lambert Obritsch, the head of the BMC maintenance department, told Mr. Sherman that he would stay at the BMC and return to the maintenance department.  Mr. Obritsch told Mr. Sherman that all rehabs would return to the departments from which they originally came, including Mr. Sherman.  The only reason Mr. Obritsch gave Mr. Sherman for

1

2

3

4

that decision was that he would not "carry" Mr. Sherman's hours at the BMC while he worked in another position in Seattle.  Mr. Sherman pointed out to Mr. Obritsch that he had been "carrying" Mr. Sherman's hours for the past five years while he worked in another department.

10.    Mr. Sherman strongly preferred that he not resume work in the maintenance department.  Among other things, he perceived that he had little chance of advancing to a better position within USPS from the maintenance department. He felt that African-American employees in particular had little chance to advance within the maintenance department.

11.    Shortly after Mr. Obritsch told Mr. Sherman that he would return to the maintenance department, Mr. Sherman filed a complaint with the EEOC.  Mr. Sherman believed that USPS's refusal to allow him to remain in the clerical position he had held was motivated either by his status as a disabled employee or by his race.  Although Mr. Sherman's EEOC complaint is not in the record, no one disputed that he timely filed it in approximately August 2005.

12.    Mr. Sherman's immediate supervisor upon his return to the maintenance department was Dale Bell.  Mr. Bell's immediate supervisor was Mr. Obritsch.

13.    Mr. Obritsch and Mr. Bell knew in August 2005 that Mr. Sherman had filed an EEOC complaint.  The job they created for him was a "modified clerk" position, which they memorialized in a formal offer letter that Mr. Sherman was required to sign.  When Mr. Sherman accepted his reassignment to the maintenance department in August 2005, he wrote on the formal offer letter that he had filed an EEOC complaint that he believed would affect his job. Ex. 17.

14.    In a January 2006 EEOC questionnaire (Ex. 1), Mr. Sherman explained his discrimination claim in greater detail.  He plainly stated that he believed that USPS had returned him to the maintenance department rather than transferring him to Seattle to continue his clerical position because he was African-American

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 4

and disabled.  He believed that African-Americans were underrepresented in all clerical and supervisory roles at the BMC, and that the refusal to keep him in a clerical position was intended to preserve that disparity.  He also believed that Cheryl Hurst, a Caucasian "rehab" who had worked in the FSO, had been reassigned to another favorable modified position, contrary to Mr. Obritsch's statement that all rehabs would return to their original departments.  He believed that two Caucasian women who were not disabled had transferred into WAIPS or FSO positions but received much higher pay.

15.   Mr. Sherman made several requests for relief in his EEOC questionnaire.  He asked that he be given additional pay to compensate for the clerical work he had already performed, that he receive a transfer to another USPS facility where he could continue performing similar clerical work at an appropriate level of pay, and he requested that USPS stop stigmatizing "rehab" employees.

16.   In a February 2007 hearing relating to a claim for unemployment compensation, Mr. Sherman made statements suggesting that he had not brought his EEOC complaint to remedy discrimination, but rather to obtain money he felt he was owed.  USPS relied on those statements at trial in an attempt to impeach Mr. Sherman.  Those statements were the subject of a March 14, 2010 order in which this court granted summary judgment to USPS, and the court does not repeat them here.  Placing those statements in the context of Mr. Sherman's trial testimony and the material he submitted to the EEOC, however, the court finds that to the extent Mr. Sherman appeared to disavow a discrimination claim, he misspoke, or understated matters in an attempt to appease Mr. Obritsch and Mr. Bell.  Mr. Obritsch and Mr. Bell had fired Mr. Sherman by that time, although Mr. Sherman hoped to be reinstated.

17.   The court finds that Mr. Sherman sincerely believed he had been discriminated against, and that he had objective evidence to support that belief.  The court in no

way suggests a finding or conclusion as to whether Mr. Sherman was actually the victim of discrimination. The administrative law judge ("ALJ") who had been assigned to hear Mr. Sherman's EEOC complaint ultimately dismissed the complaint without a hearing in late October 2006.

**Findings Relating to USPS's Decision to Terminate Mr. Sherman**

18. Melinda Varszegi, a USPS attorney who worked in Utah, represented USPS during Mr. Sherman's EEOC proceedings.

19. In August 2006, the ALJ hearing Mr. Sherman's EEOC complaint issued a "Notice of Intent to Consider Issuance of a Decision Without a Hearing." Ex. 4. The notice advised all parties to submit in writing any evidence supporting their claims or necessitating a hearing.

20. The same month, Mr. Sherman submitted a statement to the ALJ and to Ms. Varszegi. Ex. 6. He attached nine documents. He submitted eight of them to substantiate his belief that Ted Tolle, a Caucasian employee at the BMC, continued to perform WAIPS work, despite USPS's insistence that all WAIPS work had ceased at the BMC. Those documents were as follows:

   a. The cover page of a "Technical Specifications" document for a paving improvements contract, bearing a stamp indicating that it had been received at the BMC in August 2006;

   b. A one-page "letter of transmittal" related to the same paving contract, again bearing an August 2006 BMC stamp;

   c. A one-page August transmittal letter to "Western Area FSO," directed to Ted Tolle;

   d. "Invoices for Parts and Services" (these documents are listed in Mr. Sherman's statement, but not actually attached to it);

   e. Six pages excerpted from documents Mr. Sherman prepared in June 2005 relating to a painting contract;

   f. A copy of the outside of three envelopes sent in May 2006 from an outside contractor to WAIPS at the BMC;

   g. A one-page August 2006 insurance certificate that an outside contractor had obtained for USPS; and

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 6

1

       h. A copy of the outside of an envelope sent from USPS to Mr. Tolle at a "Western FSO" office in the BMC.

2

21. Mr. Sherman encountered each of these documents in executing his duties at the

3

BMC. On reassignment to the maintenance department, he was responsible for

4

receiving and distributing documents sent to BMC employees via USPS and via

5

private couriers. Mr. Sherman received documents (a) and (b) from private

6

couriers, and no one disputes that he delivered them to Mr. Tolle. Mr. Sherman

7

created document (c) himself, as a cover document to deliver to Mr. Tolle along

8

with documents (a) and (b). Document (e) was a document Mr. Sherman

9

retained from his work in WAIPS in 2005. He came across documents (f) and

10

(h) because it was his job to sort incoming USPS mail to BMC workers into a

11

central collection of cubbyholes at the BMC. USPS did not deliver mail

12

addressed to BMC workers directly to the BMC. Instead, another BMC

13

employee went to a Federal Way post office to pick up BMC mail, then gave it to

14

Mr. Sherman to be sorted and placed in the cubbyholes. Mr. Tolle himself gave

15

Mr. Sherman document (g), because he believed that Mr. Sherman would know

what to do with it.

16

22. Mr. Sherman made copies of each of the documents on a USPS copier.

17

Employees had authorization to use the copier for personal use, provided they

18

did not make more than 20 copies.

19

23. To the extent that the documents Mr. Sherman copied had a recipient, Mr.

20

Sherman timely delivered all of them in compliance with his duties. If

21

photocopying the documents delayed their delivery at all, the delay was trivial.

22

24. Ms. Varszegi submitted a reply to Mr. Sherman's submission to the ALJ. In

23

response to that reply, Mr. Sherman sent another collection (Ex. 8) of three

24

similar documents to the ALJ and Ms. Varszegi. USPS did not focus on those

25

documents in their investigation of Mr. Sherman or at trial, but like the

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 7**

documents listed above, they are documents that Mr. Sherman encountered in executing his duties at the BMC.

25. Documents submitted to the EEOC or to an ALJ hearing an EEOC dispute are kept confidential.  They are not publicly accessible.

26. Each of the documents that Mr. Sherman submitted to the ALJ were documents he could have obtained by following EEOC discovery procedures.

27. When Ms. Varszegi received the documents Mr. Sherman submitted, she did not demand that Mr. Sherman return them to her or anyone else at USPS.  She also did not ask the ALJ to strike them, seal them, redact them, or otherwise attempt to give them protection beyond the protection inherent in EEOC proceedings.

28. On September 7, 2006, Ms. Varszegi sent Nick Vendetti, the BMC plant supervisor, an email inquiring about where Mr. Sherman had obtained the documents he submitted to the ALJ.  She suggested that he may have obtained the documents without permission, and advised Mr. Vendetti that he could instruct Mr. Sherman not to do so.  She advised him to consult with the labor relations department before taking any action against Mr. Sherman, because "obviously anything you do could lead to a claim of retaliation."  Ex. 22.

29. Mr. Vendetti forwarded Ms. Varszegi's email to Mr. Bell, asking where Mr. Sherman had obtained the documents he submitted to the EEOC.

30. Mr. Bell believed that Mr. Sherman may have opened Mr. Tolle's mail to get some of the documents.  He was not sure, however, whether that violated any USPS rule.  He wrote:  "Is opening mail addressed to Ted Tolle a violation of Postal Policy or Regulation or perhaps a criminal offense?"  Ex. 22.

31. Mr. Bell made no effort to investigate whether documents sent to the EEOC are kept confidential.

32. Rather than ask Mr. Sherman how he obtained the documents he sent to the EEOC, Mr. Bell and Mr. Obritsch chose to refer the issue to the USPS's Office

of Inspector General ("OIG"). The OIG is responsible for investigating criminal conduct within USPS; it has no authority in matters of non-criminal employee discipline. Mr. Obritsch and Mr. Bell contacted OIG no later than September 11, 2006, the second workday after they received Ms. Varszegi's email.

33. The failure of Mr. Obritsch and Mr. Bell to investigate how Mr. Sherman obtained the documents is inexplicable. Both of them ignored that Mr. Sherman's job (which they created for him) was to receive incoming mail and courier documents. The assumption that he obtained the documents by unlawful means was unwarranted. In any event, that assumption would not have survived any reasonable attempt to investigate it.

34. OIG assigned Special Agent Anne Stanek to investigate the situation. Agent Stanek spoke with Mr. Obritsch, Mr. Bell, Mr. Sherman, Mr. Tolle, and Ms. Varszegi. She also spoke with Virgil Womack, a USPS employee who, according to her testimony at trial, had told her that he overheard Mr. Sherman tell another employee that he had opened mail to support his EEOC complaint. Mr. Womack's sworn statement, however, which Agent Stanek included with her investigation report, merely says that he overheard Mr. Sherman say that he had "looked at the mail." Ex. 15 (USPS00567).

35. Mr. Sherman told Agent Stanek how he had acquired the documents, and informed her that he had copied them solely to support his EEOC complaint.

36. Agent Stanek wrote a report on September 18 summarizing her investigation. She concluded that there was "no evidence of mail theft or rifling in this investigation." Ex. 15.

37. The OIG investigation confirmed that Mr. Sherman had not acted unlawfully in obtaining the documents in question. Indeed, the investigation confirmed that Mr. Sherman had obtained the documents in executing duties that Mr. Obritsch and Mr. Bell had assigned him.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 9**

38.   At about the same time as Mr. Bell and Mr. Obritsch initiated the OIG investigation, Mr. Bell contacted Susan Houser, a USPS labor relations specialist.  Her department assisted USPS management in dealing with labor union issues.

39.   Although there is no direct evidence of the specific contents of the early communications between Ms. Houser and Mr. Bell, it is plain that they worked together to build a case against Mr. Sherman.  On September 29, 2006, she sent Mr. Bell an email with the subject line "Fuel for the Fire."  Ex. 23 (USPS001098).  That email cited more than a half dozen criminal statutes, even though Ms. Houser had already reviewed the OIG report establishing that Mr. Sherman had engaged in no criminal conduct.  The court will revisit those criminal statutes later, because Mr. Bell also relied on them in his later efforts to fire Mr. Sherman.

40.   The court finds that the documents Mr. Sherman submitted to the EEOC, although USPS may have thought of them as "confidential," were not sensitive documents.  Although Mr. Obritsch and Mr. Bell knew in early September 2006 that he had photocopied the documents, they did not instruct him not to make more copies.  They did not restrict his access to "confidential" documents.  In short, they took no steps to prevent Mr. Sherman from making further copies of "confidential" documents.  Moreover, no witness was able to convince the court that the documents disclosed sensitive information.  Indeed, Ms. Houser submitted the same documents, without redaction, in connection with USPS's later effort to deny Mr. Sherman unemployment benefits.

41.   Putting aside the non-sensitive nature of the documents Mr. Sherman sent to the EEOC, the court finds that his use of the documents (mailing copies to the ALJ and Ms. Varszegi) did not put any of the information in the documents at risk of public disclosure.

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
10

42.   The court finds that Mr. Bell and Mr. Obritsch decided to fire Mr. Sherman very soon after learning that Mr. Sherman submitted the documents to the EEOC.  In addition to Ms. Houser's "Fuel for the Fire" email, the evidence shows that they discussed with Ms. Varszegi whether they could terminate Mr. Sherman, and that she advised them that they could on October 3, 2006.  At that time, neither Mr. Bell nor Mr. Obritsch had spoken with Mr. Sherman about his offense.

43.   Neither Mr. Bell nor Mr. Obritsch gave any serious consideration to lesser discipline for Mr. Sherman's offense.

44.   When Ms. Varszegi advised Mr. Bell and Mr. Obritsch that they could terminate Mr. Sherman, all parties were aware that there was a risk that termination would be retaliatory.  Ms. Varszegi raised the possibility of a retaliation lawsuit in her initial communication to Mr. Vendetti (which Mr. Obritsch and Mr. Bell reviewed).  She raised the possibility of a retaliation action again on October 3, 2006.

45.   Although Mr. Bell had already decided to terminate Mr. Sherman, he conducted three "due process investigative interviews" with Mr. Sherman.  The first interview occurred on October 4, 2006.  Mr. Bell conducted two more interviews on October 31 and November 1.

46.   In reaching its findings with respect to the due process interviews, the court relies heavily on the testimony of Ronald Dudley, Mr. Sherman's union steward, who was at each interview.  The court found his testimony credible and illuminating.

47.   Mr. Bell's interviews were essentially inquisitions.  Mr. Sherman had already admitted to the OIG that he photocopied the documents to support his EEOC claim.  Mr. Bell knew this.  Mr. Bell had little more to gain from the interviews. He and the managers he chose to assist him used the interviews to intimidate and confuse Mr. Sherman in the hope that he would make an admission they could use against him.  Mr. Sherman admitted nothing more significant that what he

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -**
**11**

had already admitted: he photocopied the documents in question to support his EEOC claim.  He did not believe that doing so violated any USPS confidentiality rules.

48.   Few, if any, USPS employees had been subjected to multiple due process interviews arising out of the same incident.  At the second and third interviews, Mr. Bell and others essentially repeated the questions they had asked at the first interview.

49.   On October 11, 2006, before the second or third due process interview, Mr. Bell and Mr. Obritsch jointly sent a request to human resources for an "adverse action letter" firing Mr. Sherman.  That request was ultimately forwarded to Ms. Houser.  Mr. Bell and Mr. Obritsch both testified that their request was merely to inquire about the possibility of termination, and that they had yet to make up their minds.  The court finds their testimony incredible.

50.   Mr. Bell and Mr. Obritsch both signed a notice of proposed removal that Mr. Bell delivered to Mr. Sherman on November 2, 2006.  Ex. 37.  The notice explained that they were firing Mr. Sherman for the following offense:  "Ethics Violation: Unauthorized Photocopying of Official documents for Personal Use/Gain."  Ex. 37.

51.   After delivering the letter to Mr. Sherman, Mr. Bell made him turn in his employee identification and escorted him out of the building.

52.   Mike Merlino, another BMC manager and a personal friend of Mr. Bell, posted a warning bulletin in the BMC entryway cautioning employees that Mr. Sherman was not to be permitted to enter the building.  This was not standard practice, and Mr. Merlino had previously posted such bulletins only for employees who presented a threat of violence or other security risk.  The bulletin remained posted for three or four days, and was visible to essentially every BMC employee.  There was no evidence that Mr. Sherman posed a threat to anybody

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -**
**12**

or that the bulletin was necessary.  The court finds that Mr. Merlino, who had participated in Mr. Sherman's "due process interviews" and consulted with Mr. Bell, shared Mr. Bell's ill will toward Mr. Sherman.  The court finds that Mr. Merlino posted the bulletin solely to humiliate Mr. Sherman among his former co-workers.

53. The November 2 letter permitted Mr. Sherman to petition Mr. Vendetti before his firing became final.  Mr. Sherman submitted a written statement, but Mr. Vendetti finalized the firing in a November 30, 2006 letter.  Ex. 39.  The letter made Mr. Sherman's termination effective on December 8, 2006.  Mr. Vendetti had relatively little personal involvement in Mr. Sherman's firing.  The court finds that Mr. Bell and Mr. Obritsch made the decision to fire him, and Mr. Vendetti merely supported their decision.

54. Mr. Bell threatened to have Mr. Dudley investigated for fraud arising out of his representation of Mr. Sherman in the due process interviews.

55. Mr. Merlino attempted to intimidate Mr. Dudley after Mr. Sherman prevailed in his union grievance.

**Findings Relating to the Offense for Which Mr. Sherman Was Fired**

56. The court reiterates that USPS fired Mr. Sherman for "unauthorized photocopying of official documents for personal use or gain."

57. Although the court finds that Mr. Sherman did not have authorization from anyone at USPS to copy the documents he submitted to the EEOC, the court also finds that Mr. Sherman was not on notice that copying the documents violated any USPS rule.  The court makes this finding for at least two reasons.  First, although Mr. Sherman signed a few documents over the course of his employment regarding his duty to safeguard confidential information, none of those documents were sufficient to advise Mr. Sherman that what he did was a violation of postal rules.  Second, USPS failed to point to any rule that Mr.

Sherman violated.  Although USPS witnesses pointed to federal regulations, federal criminal statutes, and internal regulations, not one of them was sufficient to advise a reasonable person in Mr. Sherman's shoes that he could not copy documents that he came across in the ordinary course of his duties for use in an EEOC proceeding.

58.  No USPS rule, guideline, or other document states that "unauthorized photocopying of official documents for personal use or gain" is an offense of any kind, much less one that is grounds for termination.

59.  The November 2 letter cited two portions of the Employee Labor Relations Manual ("ELM"), a section of USPS's Administrative Support Manual ("ASM"), a section of the Code of Federal Regulations, and a statute criminalizing the theft of mail.  Not even the most charitable conglomeration of these documents would support the notion that there is a USPS rule prohibiting "unauthorized photocopying of official documents for personal use or gain."

60.  In order to discipline employees in Mr. Sherman's union, USPS was required to point to a clear rule that the employee had violated.  Mr. Bell attempted to do so in his October 11, 2006 request for removal.  But he managed to cite only three portions of the ELM declaring that certain criminal statutes applied to USPS employees.  Ex. 29 (USPS000524) (citing ELM 661.2.d, 661.2.f, and 661.2.k); Ex. 23 (USPS001075-76) (relevant ELM provisions).  Putting aside that the OIG had already concluded that Mr. Sherman did not engage in criminal conduct, any review of the federal statutes to which Mr. Bell referred would have shown that they did not apply to Mr. Sherman's conduct.

61.  The disciplinary rules for employees of Mr. Sherman's union are contained in the Joint Contract Interpretation Manual ("JCIM").  For all but the most obvious offenses (like "intoxication on duty, fighting on duty, pilferage, sabotage, [or] insubordination"), the JCIM required management to point to a clear rule and to

show that the employee knew of the rule and its disciplinary consequences.  The JCIM also requires corrective discipline rather than punitive discipline.  Ex. 20.

62.   Ms. Houser could recall only four BMC employees in twelve years who had been terminated without first imposing lesser discipline.  Three of those employees participated in a mail theft ring; the other wrote a 35-page letter berating her supervisor.

63.   Although USPS did not fire Mr. Sherman for violating the "sanctity of the mail," Mr. Bell, Mr. Obritsch, and other witnesses repeatedly suggested that this violation was the real motivation for his firing.  The phrase appears in the letter Mr. Bell and Mr. Obritsch signed on October 11, 2006, requesting Mr. Sherman's termination.  Ex. 25 ("Violation of sanctity of the mails is a very serious offense for any postal employee.").

64.   USPS's own security guidelines establish that once mail is delivered to an organization, regardless of whether a particular individual at the organization is the addressee, the mail is considered "delivered" as soon as it is delivered to the organization.  Ex. 23 (USPS001066-67).  In other words, the documents that Mr. Sherman photocopied were not "mail" at all.  Mr. Bell knew of these guidelines, because he reviewed them in September 2006 as soon as he became aware that Mr. Sherman had photocopied documents.

65.   At times, USPS witnesses trivialized their obligation to point to a rule that Mr. Sherman had violated.  For example, Mr. Merlino wrote: "Any reasonable adult knows that one does not tamper with mail, something that is taught from kindergarten on…"  Ex. 40A.  Mr. Bell testified that he had known about the sanctity of the mail since he was a child.

66.   Mr. Sherman filed a timely EEOC complaint alleging that USPS retaliated against him by firing him.  The EEOC investigation into that complaint continued until at least August 2007.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -**
**15**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Findings Regarding Mr. Sherman's Union Grievance**

67.  Mr. Sherman filed a union grievance protesting his termination.  In accordance with standard policy, Mr. Bell (as the person making the termination decision) was responsible for granting or denying the grievance at Step 1.

68.  Mr. Sherman's union appealed the grievance to Step 2.  Regulations required a separate person to examine the grievance at Step 2.  Carmen Dixon was the neutral person who initially received the grievance at Step 2.  Mr. Bell wrote to her on December 21, 2006, and offered to draft the Step 2 grievance decision himself.  Ex. 40.

69.  Because Ms. Dixon failed to meet with a union representative according to a mandatory timeline, USPS and the union ultimately settled Mr. Sherman's grievance at Step 3.  The settlement, which the parties finalized on March 9, 2007, reduced Mr. Sherman's termination to a 14-day suspension, and required that he "receive back pay from December 25, 2006 through his return from work."  Ex. 41.  December 25 was the first workday that fell 14 days after Mr. Sherman's effective termination date of December 8.

**Findings Relating To Mr. Sherman's Unemployment Benefits Application**

70.  After USPS fired him, Mr. Sherman applied for unemployment benefits from the Washington Employment Security Division ("ESD").

71.  USPS informed the ESD that Mr. Sherman had been terminated for misconduct, which would prevent him from receiving unemployment benefits.  ESD scheduled a telephonic hearing in February 2007 before an ALJ.

72.  Several USPS witnesses, including Mr. Bell and Mr. Obritsch, testified at the hearing.

73.  The ALJ determined that Mr. Sherman was entitled to unemployment benefits.

**Findings Related to Mr. Sherman's Return to Work**

74. Mr. Sherman did not immediately return to work after he was reinstated in March 2007.

75. Before Mr. Sherman could return to work, USPS asked him to recertify his disability. That process did not conclude until summer 2007. In August 2007, Mr. Bell and Mr. Obritsch created a new position for Mr. Sherman: lobby director. His job would have been essentially to sit at a desk in the BMC lobby and greet visitors. Mr. Bell would again be Mr. Sherman's supervisor. For various reasons, Mr. Sherman did not actually come to work until March 24, 2008. He spent less than a day at work.

76. Mr. Sherman returned again to work on March 31, 2008. Mr. Bell ordered Mr. Sherman to remain in a windowless room. Mr. Sherman experienced a panic attack, and ultimately fled the building. Mr. Sherman took medical leave thereafter. He never returned to work.

77. Although Mr. Sherman worked very little after his reinstatement in March 2007, USPS paid him until June of 2008. At that time, Mr. Bell declared Mr. Sherman to be absent without any remaining leave.

**Findings Related to Mr. Sherman's Conviction for Theft**

78. Mr. Bell, conducting his own online research, discovered facts in December 2007 that led him to believe that Mr. Sherman had simultaneously received unemployment benefits and USPS pay. He and Mr. Obritsch asked Ms. Houser to investigate the issue, a request that ultimately led to another OIG investigation beginning in March 2008.

79. An OIG agent interviewed Mr. Sherman in March 2008.

80. In June 2008, an ESD ALJ found that Mr. Sherman had collected unemployment benefits while he was receiving pay from USPS, that he was at fault for the

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -
17**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

overpayment from March 11, 2007 through June 16, 2007, and that he was obliged to repay $5810 in benefits.  Ex. 212.

81.   USPS terminated Mr. Sherman's employment a second time in January 2009, this time because of his unlawful collection of unemployment benefits.

82.   A Pierce County Superior Court jury convicted Mr. Sherman of first degree theft in November 2010 for his receipt of unemployment benefits while receiving pay from USPS.  Mr. Sherman has appealed the conviction.

83.   Mr. Sherman began receiving disability benefits from the Social Security Administration in October 2008.  He does not intend to return to the workforce. Mr. Sherman presented very little evidence as to the basis for this disability determination.

**Findings Regarding Mr. Sherman's Emotional Damages**

84.   Mr. Sherman has post-traumatic stress disorder ("PTSD") arising from his military service in Somalia.  As a result of PTSD and other factors, Mr. Sherman occasionally suffered from depression or depression-like symptoms long before his dispute with USPS began.

85.   From the moment Mr. Sherman realized USPS was investigating him for photocopying the documents he submitted to the OIG, Mr. Sherman's emotional health deteriorated markedly.  His distress increased sharply when USPS terminated him in November 2006.  Mr. Sherman suffered from severe anxiety, paranoia, and fatigue.  Both USPS's decision to fire Mr. Sherman and the manner in which they did so exacerbated Mr. Sherman's PTSD.

86.   Mr. Sherman's family relationships suffered greatly as a result of USPS's decision to fire him.  That was in large part a result of the emotional distress described above, but was also the result of extreme financial distress brought on by Mr. Sherman's loss of USPS income.  Mr. Sherman's distress made him quick-tempered and difficult.  His wife and two of his children testified credibly

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
18

that Mr. Sherman was a dramatically changed man after USPS fired him.  Mr.

Sherman's sexual relationship with his wife also suffered.

87.    Mr. Sherman's emotional health improved marginally as he moved toward

reinstatement with USPS.  It took a severe turn for the worse, however, when

USPS began investigating him for the theft of unemployment benefits.

88.    Mr. Sherman's brother died in October 2007, causing him additional distress.

89.    Mr. Sherman received mental health treatment from the Veterans Administration.

He continued that treatment until at least March 2010.

## III.  CONCLUSIONS OF LAW

1.    The court has subject matter jurisdiction over this dispute as it presents a

question of federal law arising from Title VII of the Civil Rights Act of 1964, as

amended.  28 USC § 1331; 42 U.S.C. Sect. 2000e-5(a).  Title VII applies to

USPS.  *Galdamez v. Potter*, 415 F.3d 1015, 1018 (9th Cir. 2005).

90.    Specifically, 42 U.S.C. Sect. 2000e-5(a), Title VII's prohibition on retaliation,

provides as follows:

> It shall be an unlawful employment practice for an employer to
> discriminate against any of his employees . . . because he has
> opposed any practice made an unlawful employment practice by
> this subchapter, or because he has made a charge, testified,
> assisted, or participated in any manner in an investigation,
> proceeding, or hearing under this subchapter.

91.    A plaintiff raising a claim of retaliation at trial must prove that he was engaged in

an activity protected under federal law and that his protected activity was at least

a motivating factor in his employer's decision to take an adverse employment

action against him.  *Browning v. United States*, 567 F.3d 1038, 1042 (9th Cir.

2009).  In the context of retaliation, an adverse employment action is any action

that is reasonably likely to deter an employee from engaging in protected

activity.  *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000).

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
19

92.   Mr. Sherman engaged in protected activity when he filed his EEOC discrimination complaint and when he supported that complaint by submitting photocopied USPS documents to the ALJ considering his complaint in August 2006.

93.   On March 14, 2011, this court granted summary judgment for USPS because Mr. Sherman had not presented evidence sufficient to create a dispute of material fact over whether he raised a valid complaint of discrimination.  The court later vacated that decision on reconsideration after Mr. Sherman presented additional evidence.  The court discussed the law applying to that question in that order, and incorporates that discussion by reference here.  Based on the evidence presented at trial, the court concludes that Mr. Sherman's EEOC discrimination complaint was valid, and that his participation in the pursuit of that claim was thus protected activity.

94.   The court concludes that USPS terminated Mr. Sherman because of his protected activity, specifically because he submitted documents to the EEOC to support his discrimination claim.  This conclusion requires additional explanation.

95.   An employee pursuing an EEOC complaint does not have carte blanche to do whatever he chooses to support that complaint.  In some cases, courts have found that an employee who violates the law or the rules of his employer to support an EEOC complaint can nonetheless be subject to discipline or termination.

96.   A court considering the tension between workplace rules and protected activity must balance Title VII's protection of employees engaging in reasonable activity in opposition to discrimination against Congress's desire not to unduly interfere with an employer's interest in managing employees.  *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996).  At least when an employee opposes a practice made unlawful under Title VII, that activity is protected only if it is reasonable in light of the employer's interest in maintaining

1
2

a "harmonious and efficient" workplace. *Id.* (internal quotations and citations omitted).

3
4
5
6
7
8
9
10
11

97.   Although the Ninth Circuit has not, so far as the court is aware, squarely confronted this issue, other federal appeals courts have recognized that the protection afforded to an employee who "made a charge, testified, assisted, or participated" in a Title VII-related hearing, investigation, or proceeding is broader than the protection afforded to employees who merely oppose practices that Title VII makes unlawful. *See*, *e.g.*, *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 719-20 (6th Cir. 2008); *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 n.4 (4th Cir. 1998). The court believes that the Ninth Circuit would reach the same result, although the court's decision today would be the same even if it is mistaken in this regard.

12
13
14
15
16
17
18
19
20
21
22

98.   Balancing USPS's legitimate workplace interests in protecting the confidentiality of documents against Mr. Sherman's right to support his own EEOC complaint, the court concludes that Mr. Sherman's photocopying of the documents in question was a protected activity. The court accepts that Mr. Sherman had no specific authorization to copy the documents in question, and thus may have, in the weakest sense, violated a workplace rule, even if that rule was at best amorphously defined. Nonetheless, given that the documents in question were not sensitive, and given that Mr. Sherman's use of the documents did not expose them to anyone outside USPS except the ALJ, the interest in protecting Mr. Sherman's right to participate in EEOC proceedings overwhelms USPS's workplace interest.

23
24
25

99.   Put another way, USPS has the right to develop an ex post facto rule prohibiting the "unauthorized photocopying of official documents for personal gain." USPS does not, however, have the right to terminate an employee for violating that rule where the only "personal gain" the employee might achieve is the support of his

EEOC discrimination complaint.  The court further concludes that even the two-week suspension without pay that USPS later imposed is an impermissible retaliatory action in light of the *O'Day* balancing test.

100.  Although the employer's intent is not relevant in a retaliation case, the court concludes that USPS's termination of Mr. Sherman was at best deliberately indifferent to Mr. Sherman's statutorily protected rights, and was more likely intended to deliberately punish Mr. Sherman for exercising those rights.  The record is replete with evidence showing that the decisionmakers involved either completely ignored Mr. Sherman's Title VII rights, or proceeded with firing him despite his rights.  That Mr. Bell and his friend Mr. Merlino threatened Mr. Dudley with reprisal for assisting Mr. Sherman is further evidence of a retaliatory motive.

101.  Putting aside that USPS explicitly terminated Mr. Sherman for supporting his own EEOC complaint, the court concludes that other evidence supports a finding of a retaliatory motive.  In particular, the court concludes that Mr. Bell's fixation on "investigating" Mr. Sherman, terminating him, ensuring that he did not receive unemployment benefits, and ultimately ensuring his prosecution for theft is strong evidence of a motive that exceeds any legitimate workplace motive.  Mr. Bell gave no consideration to Mr. Sherman's statutory right to do what he did.

102.  USPS's efforts to give a legitimate explanation for Mr. Sherman's termination were not convincing.  In particular, USPS's constant invocation of the "sanctity of the mail" was not at all compelling.  Mr. Sherman's conduct in no way impinged on the sanctity of the mail, and the court concludes that USPS's insistence to the contrary belies a retaliatory motive.

103.  Consistent with the principles the Supreme Court expressed in *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011), the court concludes that although Mr.

Vendetti had the ultimate authority over Mr. Sherman's firing, the proximate cause of Mr. Vendetti's decision was the retaliatory conduct of Mr. Bell and Mr. Obritsch.  Even were this not so, Mr. Vendetti knew that he fired Mr. Sherman for supporting his EEOC complaint.

104.    The parties dispute what retaliatory conduct is actionable in this lawsuit.  Mr. Sherman argues that USPS continued to retaliate against him until his second termination.  In the Ninth Circuit, the employee's EEOC charge of retaliation determines the scope of actionable conduct.  That scope extends not merely to the conduct specifically identified in the EEOC charge, but to all conduct that one would reasonably expect to be the subject of an EEOC investigation into the charge.  The court has made this determination of law in two prior orders in this case, both on December 2, 2009, and on August 31, 2011.  The court incorporates those decisions by reference.  The Ninth Circuit has reiterated this view as recently as January 2012.  *Shelley v. Geren*, No. 10-35014, 2012 U.S. App. LEXIS 623, at *16 (9th Cir. Jan. 12, 2012).

105.    The court concludes that the only retaliatory conduct that falls within the scope of this lawsuit is as follows: USPS's investigation preceding Mr. Sherman's firing, his firing (and subsequent two-week suspension), the posting of his photograph in the entryway to the BMC, and USPS's efforts to deny him unemployment benefits.  Each of these actions is within the scope of a reasonable EEOC investigation into Mr. Sherman's charge of retaliation.  The court further concludes that each of these acts constitutes an adverse employment action.

**Conclusions Regarding Mr. Sherman's Damages**

106.    Mr. Sherman suffered severe emotional distress as a result of the retaliatory conduct identified above.

107.    The court awards Mr. Sherman $60,000 to compensate him for his emotional distress.  In making this award, the court concludes that any distress Mr.

Sherman experienced as a result of the investigation of USPS (and state authorities) into his theft of unemployment benefits, and his subsequent conviction, is not compensable.

108.  The court concludes that Mr. Sherman lost only two weeks of pay and benefits as a result of USPS's retaliatory conduct.  The court concludes that Mr. Sherman did not prove that his current or future inability to work is the result of USPS's retaliatory conduct.

109.  The court concludes that no later than June 2008, USPS had a legitimate, non-retaliatory reason for terminating Mr. Sherman: his unlawful receipt of unemployment benefits.  Although the court concludes that Mr. Sherman never would have committed that unlawful act but for USPS's retaliatory conduct, the court nonetheless concludes that Mr. Sherman must bear the ultimate responsibility for that act and its consequences.

110.  The court awards Mr. Sherman $2,000 to compensate him for wages and benefits lost as a result of USPS's retaliatory conduct.

## IV.  ORDER

The court directs the clerk to DISMISS this case and enter judgment for Mr. Sherman.  The judgment shall award Mr. Sherman $62,000.

DATED this 15th day of February, 2012.


The Honorable Richard A. Jones
United States District Court Judge

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -
24**